IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

JOHN KRPAN,                              )
                                         )
            Plaintiff,                   )
                                         )
      v.                                 )        No. 1:15-cv-458 (LMB/MSN)
                                         )
REGISTRY OF INTERPRETERS FOR THE         )
DEAF, INC.,                              )
                                         )
            Defendant.                   )

MEMORANDUM OPINION

Plaintiff John Krpan ("plaintiff" or "Krpan") instituted this civil action against defendant

Registry of Interpreters for the Deaf, Inc. ("defendant" or "RID"), alleging that certain

certifications RID provides and the testing processes for those certifications violate Title III of

the Americans with Disabilities Act ("ADA"). In Count I of the two-count Complaint, plaintiff

alleges that the National Interpreter Certification ("NIC") exam violates Title III of the ADA by

measuring the sensory skills of NIC candidates rather than their "aptitude or achievement level"

and by acting "as a certificate to prospective employers" that an NIC-certified individual is not

disabled. Compl. [Dkt. No. 1] ¶¶ 24-25, Apr. 8, 2015. In Count II, he alleges that the Certified

Deaf Interpreter ("CDI") credential violates Title III of the ADA by measuring an applicant's

sensory skills rather than aptitude and by acting "as a certificate to prospective employers that

the [CDI credential] holder is disabled, which the ADA would otherwise forbid the prospective

employer from asking during the interview process." Id. ¶¶ 27-28.

In addition to seeking attorneys' fees and costs, plaintiff seeks a permanent injunction

that would bar RID from inquiring into an applicant's disability status, from requiring that an

applicant have a certain disability status, and from stating that holders of a credential have or do

not have a disability. Id. at 4. Krpan also seeks an order requiring RID to permit him to apply for

the NIC certification and to sit for the NIC exam "with all accommodations otherwise required

by 28 C.F.R. § 36.309, including but not limited to an interpreter to translate Krpan's ASL into

spoken English." Id. at 4-5. RID responds that plaintiff's claims are time-barred and that plaintiff

lacks standing to pursue his claim regarding the NIC exam. RID also contends that neither the

NIC nor CDI credentials or exams violate the ADA and that the plaintiff's requested changes or

accommodations would place an undue burden on RID.

    Before the Court are the parties' cross-motions for summary judgment. For the reasons

that follow, defendant's motion will be granted and plaintiff's motion will be denied.

## I.    BACKGROUND

    Plaintiff is a legally deaf individual who is categorized as "profoundly deaf." Dep. of

John Krpan [Dkt. No. 48-1] ("Pl.'s Dep.") 37:3-4. Although he can hear some sounds, plaintiff is

unable to "interpret what those sounds mean" and "cannot hear verbal communication at all."

Pl.'s Dep. 37:5-10. There is also no indication in the record that plaintiff can or does

communicate verbally. Plaintiff characterizes himself as "a deaf person fluent in American Sign

Language ("ASL") and other forms of nonverbal communication" who "makes his living as an

interpreter for people who are deaf and hard of hearing." Mem. of P&A in Supp. of Pl.'s Mot. for

Summ. J. [Dkt. No. 45] ("Pl.'s Br.") at 1, Oct. 9, 2015.

    Defendant is a non-profit 26 U.S.C. § 501(c)(3) organization that provides credentialing

services for different types of interpreters for the deaf and hard of hearing. Def. Registry of

Interpreters for the Deaf, Inc.'s Mem. in Supp. of its Mot. for Summ. J. [Dkt. No. 48] ("Def.'s

Br.") at 4, Oct. 9, 2015; Compl. ¶¶ 9-10. RID's National Interpreter Certification ("NIC") and

Certified Deaf Interpreter ("CDI") credential are the only credentials at issue in this action.[1] See

Compl. ¶¶ 11, 20; Def.'s Answer [Dkt. No. 5] ("Answer") ¶¶ 11, 20, May 8, 2015. RID's

Department of Certification establishes the standards for the examinations interpreters must take

to obtain NIC and CDI certifications and reviews any requests for accommodations by test-

takers. Def.'s Br. at 5. "[A]ll of [RID's] tests are driven by market demands" and are meant "to

capture the qualities and skill sets that a practitioner needs to be able to fulfill" in various

situations. Dep. of Registry of Interpreters for the Deaf, Inc., by and through its Corp.

Representative Anna Witter-Merithew [Dkt. No. 48-2] ("Witter-Merithew Dep.") 57:16-21.

RID provides a candidate handbook for each certification. The NIC Candidate Handbook

states that the application process is "open to interpreting professionals who: are at least 18 years

of age; are hearing; have the [requisite] knowledge and skills…; meet RID's current educational

requirement; and agree to abide by the NAD-RID Code of Professional Conduct." NIC

Candidate Handbook 2015 [Dkt. No. 48-3] ("NIC Handbook") at 8. According to RID, the term

"hearing" as used in the NIC Handbook refers to "someone who moves through the world

receiving information directly auditorily" and who is "bilingual" in ASL and spoken English.

Witter-Merithew Dep. 19:6-12. Although the NIC Handbook states that the process is "open" to

professionals who "are hearing," NIC Handbook at 8, neither the handbook nor any other

evidence in the record shows that candidates are required to provide proof of their hearing ability

before or during the application process. Moreover, the parties agree that the NIC exams do not

---

[1] Plaintiff's Complaint also refers to the Specialist Certificate: Legal ("SC:L") that RID provides, see Compl. ¶ 16, but plaintiff does not include the SC:L certification in either count in which he alleges violations of Title III of the Americans with Disabilities Act, nor does plaintiff discuss the SC:L certification in any of his summary judgment pleadings; therefore, this certification does not appear to be at issue in the action.

require that candidates undergo an "audiogram" to measure their hearing ability. See Def.'s Br. at 9; Pl.'s Opp'n to Def.'s Mot. for Summ. J. [Dkt. No. 54] ("Pl.'s Opp'n") at 2, Oct. 23, 2015.

Instead, the NIC application process includes a written "NIC Knowledge" test and an oral "NIC Interview and Performance" exam ("the exam"), the latter of which is at issue in this litigation. See NIC Handbook at 9; Compl. ¶ 14. The exam is "designed to test the specific market requirements for an individual who is bilingual and can simultaneously render from spoken English into ASL and from ASL into intelligible spoken English." Witter-Merithew Dep. 27:14-18. The hour-long exam uses "video-based vignettes" during which "the candidate watches the exam problems on a video screen and the candidate's signed and spoken responses are recorded." NIC Handbook at 21. The vignettes present both ethical dilemmas and real-world situations and require that the candidate provide simultaneous interpretation both from ASL to spoken English and from spoken English to ASL without pausing or changing the timing of the test once it begins. Id. at 22.

Candidates must be able to "directly hear the information and simultaneously, instantaneously render it into sign language" and also to "watch sign language and simultaneously, immediately render it into clear intelligible spoken English." Witter-Merithew Dep. 21:21-22:3. As a result, test-takers are evaluated on their "spoken English articulation competencies, intonation, use of inflection, reciprocity, pacing, [and] stress." Witter-Merithew Dep. 43:14-16. Due to these requirements, RID has determined that an individual who is profoundly deaf could not pass the exam as structured and has further determined that it could not provide an accommodation in the form of an interpreter to a profoundly deaf individual without fundamentally altering the test and placing an undue burden on RID. See Def.'s Br. at 6-7.

4

In contrast to the NIC certification, the CDI credential is limited to interpreting professionals who "are deaf or hard-of-hearing." CDI Candidate Handbook 2013 [Dkt. No. 48-6] ("CDI Handbook") at 8. Because the exam is "designed to evaluate deaf interpreters," CDI candidates must provide "[a]n official letter from a physician or audiologist providing verification of hearing loss" before they can apply. Id. at 12. The Performance Exam does not measure spoken English competence, Witter-Merithew Dep. 74:15-16; instead, it "measures someone's ability to work…monolingually" by "go[ing] from print text to [ASL], [and] from sign language to sign language." Witter-Merithew Dep. 19:19-21, 71:17-18. Specifically, the test requires candidates to "interpret a written text to a Deaf consumer;" "provide ASL interpreting to the Deaf consumer while working with a hearing interpreter as a team;" "provide simultaneous interpretation to consumers who are Deaf-Blind or Deaf-close-vision for a Deaf presenter;" and "provide mirror interpreting for audience members' comments after a forum." CDI Handbook at 24.

RID explains that the CDI Performance Exam and credential are intended "to capture the life experience of individuals who move through society as visual, spatial, gestural communicators, and who could bring to the interpreting task a unique and more sophisticated level of competence than is available with the NIC interpreters," because hearing interpreters do not "share the common life experience" of a deaf individual. Witter-Merithew Dep. 58:1-7. That common life experience, according to RID, allows deaf interpreters "to deal with deaf individuals who may not be sufficiently competent in [ASL]" or who may "have very idiosyncratic ways of using sign language that surpass the experience of most hearing interpreters," because a deaf interpreter is better equipped to recognize non-ASL signs and "to

creatively use gestures and iconic behaviors that convey complex information."[2] Witter-Merithew Dep. 59:17-60:8.

In the words of RID's expert Dr. Patrick Boudreault ("Boudreault"),[3] professionals who obtain CDI credentials "have native or near-native proficiency in ASL, and share the Deaf experience with semi-lingual deaf consumers or even bilingual deaf consumers; this 'sameness' is an important factor in establishing rapport and communicating effectively." Expert Report [Dkt. No. 48-4] ("Boudreault Report") at 7. By way of contrast, Boudreault states that hearing interpreters typically lack "the intrinsic characteristics required to navigate the 'Deaf-World' experience and the flexibility of visual-gestural communication" because they have not been "immersed in the visual-gestural world" and therefore cannot "broaden their linguistic and non-linguistic range beyond normal linguistic channels."[4] Id. As a result, when serving foreign, semi-lingual, illiterate, deaf-blind, or other types of deaf consumers who do not use traditional ASL, these NIC interpreters and other hearing interpreters often "team up with CDIs to ensure that the quality of communication [is] being maintained throughout the interpretation process." Id. Therefore, a CDI interpreter's job duties may include translating the communications of a less literate deaf individual into standard ASL that an NIC interpreter can then translate into spoken English. Witter-Merithew Dep. 37:19-38:1.

---

[2] Witter-Merithew provides various examples of the type of consumers who merit the services of a CDI interpreter, such as deaf juveniles, deaf children with idiosyncratic behaviors, deaf immigrants that do not know ASL, individuals with cerebral palsy that do not use ASL in a standardized way, deaf-blind individuals, individuals with cognitive limitations, and illiterate or uneducated persons. Witter-Merithew Dep. 39:6-11, 40:2-11, 60:1-8, 61:9-10, 71:18-20, 71:15-18.

[3] Plaintiff did not retain an expert or provide any evidence to rebut defendant's expert report.

[4] Boudreault states that children raised by deaf parents, "commonly known as Children of Deaf Adults (CODAs)," may possess the "necessary qualities" of a deaf interpreter, Boudreault Report at 7, but that CODAs still typically "prefer to work with a CDI to ensure incorporation of a clear and accurate communication process with a less literate deaf individual." Id. at 5.

Krpan takes issue with aspects of both the NIC and CDI certifications. Krpan first complained to RID about its use of "deaf" in 1993, when the credential was called "Certified Deaf Interpreter-Provisional." Def.'s Br. at 13; Pl.'s Dep. 85:9-13. After the name changed to CDI, plaintiff renewed his complaints.[5] Between 2010 and 2015, plaintiff sent multiple emails to RID demanding that RID change the name and explaining why he believes the name to be illegal and a "hindrance for interpreting jobs." See Pl.'s Dep. Ex. 16; see also Pl.'s Dep. Exs. 11, 13, 14. Although Krpan stated at one point that he refused to obtain the CDI credential because he "object[ed] to the name," Pl.'s Dep. Ex. 13 at 3, he nevertheless applied for the credential "four or five times" between 2002 and 2012,[6] Pl.'s Dep. 97:16-98:5, and obtained CDI certification in April of 2014 after passing the exam in June of 2013. Pl.'s Dep. 106:2-7.

Krpan began complaining about the NIC exam in 2010. Def.'s Br. at 28; Pl.'s Opp'n at 3. Plaintiff testified that he met with former RID Executive Director Clay Nettles ("Nettles") in 2010 to discuss the NIC exam, and that Nettles told plaintiff that the NIC was "for hearing interpreters, the CDI's for deaf interpreters." Pl.'s Dep. 128:22-129:1; Def.'s Br. at 12. In 2013, plaintiff met with former RID Executive Director Shane Feldman ("Feldman") by video conference and asked why he "wasn't able to take the NIC," to which Feldman responded by "referr[ing] [plaintiff] to the website" and telling plaintiff that "the NIC was for hearing interpreters and that CDI was for deaf people." Pl.'s Dep. 126:8-127:10. Plaintiff also claims that he was told by Earl Fleetwood, then-Director of the RID Department of Certification, that

---

[5] Krpan believes that the use of the word "deaf" in the CDI name is illegal because it announces that a CDI-credentialed individual is disabled, thereby enabling discrimination in employment and publicly announcing private medical information. Pl.'s Dep. 87:2-22.

[6] Due to gaps in the deposition transcript provided by the parties, it is unclear how many times Krpan took the CDI exam and how many times he passed or failed, but he admits to failing the exam in 2008. Pl.'s Dep. 97:14-15.

plaintiff was not permitted to apply for the NIC and should instead apply for the CDI credential.[7]
Pl.'s Dep. 73:12-74:19. Despite these discussions with RID employees, plaintiff has never
applied to take the NIC exam. Pl.'s Dep. 73:9-11.

Plaintiff commenced this civil action on April 8, 2015, by filing a two-count Complaint.
The parties have completed discovery and filed their cross-motions for summary judgment,
which motions are now before the Court, and have engaged in oral argument of their motion. For
the reasons that follow, summary judgment will be granted to the defendant.

## II. DISCUSSION

Both parties have moved for summary judgment on both counts of plaintiff's Complaint.
Plaintiff argues that the NIC violates the ADA by impermissibly measuring candidates' impaired
sensory skills and contends that none of the exceptions in the regulations are applicable. Mem. of
P&A in Supp. of Pl.'s Mot. for Summ. J. [Dkt. No. 45] ("Pl.'s Br.") at 6. Similarly, plaintiff
argues that the CDI illegally measures applicants' impaired sensory skills and "requires the
holder to have a certain disability status which is unnecessary to the actual skills being tested,"
because a hearing individual could pass the test. Id. at 8-9. In making this argument, plaintiff
alludes to a purported desire on the part of the hearing members of RID to restrict CDI holders to
"narrow categories of work." Id. at 9. Additionally, plaintiff argues that the relevant regulations
deserve deference, that the ADA's statement of purpose and legislative history support his
contentions, and that he satisfies the standards for issuing a permanent injunction.

In its cross-motion, defendant argues that plaintiff's Complaint is completely time-barred
and that plaintiff lacks standing to pursue his claim regarding the NIC exam. Def.'s Br. at 3.
With regards to the substantive merits of plaintiff's claims, defendant argues that the NIC

---

[7] It is not clear from the record when that communication occurred.

examination legally measures a candidate's ability to simultaneously translate spoken English into ASL and vice versa, as well as that the plaintiff's requested changes to the test and accommodations would fundamentally alter the test and place an undue burden on RID. Id. at 2. As to the allegations in Count II, defendant contends that its use of "deaf" in the CDI credential does not violate the ADA because the ADA does not require confidentiality in this context and that the term "deaf" is not a discriminatory term but is instead a term of empowerment. Id. Finally, defendant argues that the requirement that CDI candidates be deaf or hard of hearing does not violate the ADA because it does not discriminate against any individuals with a disability. Id.

### A.  **Standard of Review**

Summary judgment is merited where the record demonstrates that "there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When a court is presented with cross-motions for summary judgment, it must consider each motion "separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (quoting Philip Morris Inc. v. Harshbarger, 122 F.3d 58, 62 n.4 (1st Cir. 1997)) (internal quotation marks omitted). Therefore, with respect to each motion, the court must "resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion," id. (quoting Wightman v. Springfield Terminal Ry. Co., 100 F.3d 228, 230 (1st Cir. 1996)) (internal quotation marks omitted); however, all inferences drawn in the nonmovant's favor  must "fall within the range of reasonable probability and not be so tenuous as to amount to speculation or conjecture." Thompson Everett, Inc. v. Nat'l Cable Adver., L.P., 57 F.3d 1317, 1323 (4th Cir. 1995).

Furthermore, "[t]he mere existence of a scintilla of evidence in support of the [opposing party's] position will be insufficient" to merit summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); see also Am. Arms Int'l v. Herbert, 563 F.3d 78, 82 (4th Cir. 2009) ("[A] nonmovant cannot defeat summary judgment with merely a scintilla of evidence."). Rather, a genuine issue of material fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," Anderson, 477 U.S. at 248, and any existing factual dispute must be both "material" and "genuine," such that it has the potential to "affect the outcome of the suit under the governing law." Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001).

A movant may prevail on a Rule 56 motion by showing "that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 322-25 (1986) ("[T]he plain language of [Rule 56(a)] mandates the entry of summary judgment...against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."); see also Rhodes v. E.I. du Pont de Nemours & Co., 636 F.3d 88, 94 (4th Cir. 2011) ("[S]ummary judgment is proper if the nonmoving party fails to make a sufficient showing of an essential element of that party's case."). The nonmoving party must provide "specific facts," not simply "metaphysical doubt[s]," establishing that there is a genuine dispute for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (internal quotation marks omitted). Should the nonmovant fail to do so with respect to an "essential element" of his case, the movant is entitled to summary judgment as a matter of law. Rhodes, 636 F.3d at 94.

### B. Standing

Defendant briefly raises the issue of standing only with respect to plaintiff's NIC claim and only after making its substantive arguments; however, because standing is part of the case or controversy "threshold requirement," this opinion will address the issue first. See City of Los Angeles v. Lyons, 461 U.S. 95, 101 (1983). Defendant argues that plaintiff has not suffered an injury-in-fact with regards to Count I because "he never applied to take the NIC examination, formally requested the accommodation of a second interpreter, or was ever formally denied that accommodation," and because NIC candidates are not required to prove their hearing ability or lack thereof before applying. Def.'s Br. at 21. Plaintiff responds that he has shown likely injury due to RID's policies because RID employees have told plaintiff he could not apply, the NIC materials state that the test is limited to hearing individuals, and the NIC materials communicate to prospective employers that an NIC holder is not deaf. Pl.'s Opp'n at 8.

The "irreducible constitutional minimum of standing" requires that a plaintiff (1) have suffered "an injury in fact" that invades "a legally protected interest" and is both "concrete and particularized" and "actual or imminent;" (2) that injury is fairly traceable to the defendant's challenged conduct; and (3) it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (internal quotation marks and citations omitted). The injury-in-fact "must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'" Lyons, 461 U.S. at 102 (citations omitted).

Plaintiff cites Shaywitz v. American Board of Psychiatry and Neurology, 675 F. Supp. 2d 376 (S.D.N.Y. 2009) for the proposition that this constitutional minimum is satisfied when a licensing entity's policies are likely to cause an injury to a plaintiff. Pl.'s Opp'n at 8. The Shaywitz plaintiff, who suffered from several disabilities, passed the written portion of the

11

Board's psychiatry certification exam but after three attempts was unable to pass the oral and performance portion of the exam. Shaywitz, 675 F. Supp. 2d at 380-81. In resolving the defendant's motion to dismiss, the Shaywitz court ruled that the plaintiff had alleged sufficient facts to establish "the inference that he [would] suffer real and immediate future discrimination by the Board" because he had requested certification by taking the exam, making a "pre-suit demand," and filing the lawsuit. Id. at 383. The court explained that the plaintiff also faced future discrimination because his demonstrated "eagerness" to obtain certification in order to practice psychiatry at his desired level meant that he would apply for certification again and again be denied; however, the plaintiff was not required to register again to have standing because his previous attempts showed that such an effort would be "futile." Id. at 384.

Shaywitz did not alter the requirement that an injury-in-fact be "actual or imminent" and does not support plaintiff's contentions. Unlike the Shaywitz plaintiff, Krpan has not shown that he actually applied for certification, requested an accommodation for the required exam, or took the exam, nor has RID rejected an application or demand for certification by Krpan. Therefore, Krpan has not alleged as conclusively as the Shaywitz plaintiff that such efforts would be futile or that he would suffer real and immediate future harm.

On the other hand, Krpan presents unrebutted evidence that several high-ranking RID employees told him that he could not apply for the NIC exam and that the NIC exam is not open to deaf individuals like Krpan. Although it is undisputed that RID does not require proof of hearing ability to obtain NIC certification, the NIC handbook states that the exam is "open" to "hearing" individuals, and RID states that "that's the audience that [RID is] trying to capture," an audience with "the requisite skill set to do what the exam requires." Witter-Merithew Dep. 17:22-18:3. Moreover, the record establishes that a deaf individual like Krpan lacks that "skill

set" and could not pass the NIC performance exam absent the accommodation or changes in the exam that he seeks.

Although the issue is close, plaintiff's unrebutted evidence that RID employees have told him he cannot or should not take the NIC exam, that the NIC handbook states it is open to hearing individuals, and that he could not pass the exam absent an accommodation opposed by RID is sufficient to show that plaintiff has suffered or will suffer an actual or imminent injury-in-fact. Plaintiff has shown a desire to obtain NIC certification, has been overtly discouraged from applying, and could not pass the examination as it exists, because RID opposes any type of accommodation or change Krpan wants and would need to be able to pass the exam. Therefore, Krpan has standing to pursue his NIC claim.

### C. **Statute of Limitations**

Defendant raises another threshold issue with respect to both counts of plaintiff's Complaint by arguing that they are time-barred. Specifically, defendant argues that the one-year statute of limitations under the Virginia Rights of Persons with Disabilities Act, Va. Code Ann. §§ 51.5-40 et seq., ("Virginia Disabilities Act") applies to plaintiff's claims and that his claims accrued years before he instituted this action because he knew or had reason to know of his purported injuries as early as 2010. Def.'s Br. at 15-16, 21-22. Plaintiff responds that his claims are not barred because RID's alleged violations are ongoing and therefore "the statute of limitations period starts over with each new day that RID does not change its policies." Pl.'s Opp'n at 5-6.

Title III of the ADA establishes that a court may award injunctive relief to "any person who is being subjected to discrimination on the basis of disability in violation of this subchapter or who has reasonable grounds for believing that such person is about to be subjected to

discrimination in violation of section 12183 of this title." 42 U.S.C. § 12188(a)(1); see also 42

U.S.C. § 12183 (regulating new construction and alterations in public accommodations and

commercial facilities). Title III further provides that "a person with a disability" is not required

"to engage in a futile gesture if such person has actual notice" that an individual does not intend

to comply with the ADA. Id. Title III does not, however, provide a statute of limitations, and

courts must instead "borrow the state statute of limitations that applies to the most analogous

state-law claim." A Soc'y Without a Name, for People Without a Home, Millennium Future-

Present v. Virginia, 655 F.3d 342, 347 (4th Cir. 2011). The Fourth Circuit has determined that

the one-year statute of limitations established by the Virginia Disabilities Act controls ADA

claims brought in Virginia. Id. at 348. Like other federal civil rights claims, an ADA claim

accrues and the limitations period begins to run "when the plaintiff knows or has reason to know

of the injury which is the basis of the action." Id. (quoting Cox v. Stanton, 529 F.2d 47, 50 (4th

Cir. 1975)) (internal quotation marks omitted). A claim may still be timely beyond this period if

the plaintiff establishes that the alleged injury is due to a continuing violation of the statute, and

courts outside of the Fourth Circuit have interpreted § 12188(a)(1) as clarifying that continuing

or threatened violations of the ADA are violations within the meaning of the Act. See Scherr v.

Marriott Intern., Inc., 703 F.3d 1069, 1075-76 (7th Cir. 2013) (citing Pickern v. Holiday Quality

Foods, Inc., 293 F.3d 1133, 1136 (9th Cir. 2002)).

  To show that an alleged violation is a continuing one, a plaintiff generally "must establish

that the unconstitutional or illegal act was a fixed and continuing practice," meaning that it "did

not occur just once" but instead involved "a series of separate acts" where "the same alleged

violation was committed at the time of each act" and the limitations period therefore "beg[an]

anew with each violation." Soc'y Without a Name, 655 F.3d at 348 (quoting Nat'l Adver. Co. v.

14

City of Raleigh, 947 F.2d 1158, 1166 (4th Cir. 1991)) (internal quotation marks omitted). Only "continual unlawful acts" establish a continuing violation, whereas the "continuing ill effects of an original violation" do not. Id. (citing City of Raleigh, 947 F.2d at 1166). For example, in A Society Without a Name, for People Without a Home, Millennium Future-Present v. Virginia, 655 F.3d 342 (4th Cir. 2011), the Fourth Circuit rejected the plaintiff's argument that the state's decision to locate a homeless shelter in an area "removed from Richmond's downtown community" constituted a continuing violation of the ADA, id. at 344-45, reasoning that "[t]he fact that the Conrad Center is still located on Oliver Hill Way and continues to offer services to the homeless...does not amount to a continuing violation, but rather amounts to the continuing effect of the original decision to locate the Conrad Center on Oliver Hill Way." Id. at 348-49.

Defendant argues that plaintiff's claims accrued as early as 2010, when he began complaining to RID about his concerns regarding the NIC and CDI certifications. Def. Registry of Interpreters for the Deaf, Inc.'s Reply in Supp. of its Mot. for Summ. J. [Dkt. No. 56] ("Def.'s Reply") at 6, Oct. 29, 2015. Plaintiff responds that RID's alleged ADA violations are continuing ones and cites Scherr v. Marriott Intern., Inc., 703 F.3d 1069 (7th Cir. 2013), and Pickern v. Holiday Quality Foods, Inc., 293 F.3d 1133 (9th Cir. 2002), for the proposition that the statute of limitations period continues for as long as RID continues to maintain its current policies. See Pl.'s Opp'n at 5-6. Defendant contends that this authority is inapplicable because it relates to public accommodations rather than to testing, and urges the Court to look instead to Soignier v. American Board of Plastic Surgery, 92 F.3d 547 (7th Cir. 1996), and related case law finding that the statute of limitations runs when a plaintiff discovers the original ADA violation, not when the plaintiff confirms that the act is unlawful or realizes its full consequences. Def.'s Reply at 5 (citing Soignier, 92 F.3d at 551-52; Lever v. Northwestern Univ., 979 F.2d 552, 553 (7th

15

Cir. 1992); and <u>Cada v. Baxter Healthcare Corp.</u>, 920 F.2d 446, 449-50 (7th Cir. 1990)).

Defendant also argues that plaintiff's ongoing complaints between 2010 and 2015 should be

considered "mere requests to reconsider" that do not extend the limitations period. <u>Id.</u> at 6

(quoting <u>Delaware State College v. Ricks</u>, 449 U.S. 250, 258 (1980)) (internal quotation marks

and alteration omitted).

 The parties agree that there is no Fourth Circuit precedent on point, and the authorities on

which the parties rely are not exactly on point. Nonetheless, an evaluation of the relevant

authority and of the Fourth Circuit's treatment of continuing violation claims demonstrates that

plaintiff's claims should be considered time-barred. Plaintiff relies first on <u>Pickern</u>, in which the

plaintiff, a paraplegic confined to a wheelchair, sought injunctive relief requiring the defendant's

grocery store to eliminate "architectural barriers" that made his access to the store difficult.

<u>Pickern</u>, 293 F.3d at 1135. The district court granted summary judgment to the defendant on the

basis that the plaintiff "had not attempted to enter the store during the limitations period" and

therefore "had not actually encountered any barriers during that period," meaning that his claim

was untimely and he lacked standing. <u>Id.</u> The Ninth Circuit reversed and held that the plaintiff's

claim was not time-barred because "once a plaintiff has actually become aware of discriminatory

conditions existing at a public accommodation, and is thereby deterred from visiting or

patronizing that accommodation, the plaintiff has suffered an injury," one that continues for "[s]o

long as the discriminatory conditions continue, and so long as a plaintiff is aware of them and

remains deterred." <u>Id.</u> at 1136-37. The court further determined that the plaintiff had standing

because he had actual knowledge of the store's barriers to access and was deterred by them.[8] Id.
at 1138.

The Seventh Circuit followed this line of reasoning in Scherr, in which the disabled
plaintiff was injured by a spring-hinged door closer at a Courtyard Marriott Hotel and more than
four years later sought injunctive relief against that Marriott hotel and fifty-six other Courtyard
Marriott hotels under the ADA. Scherr, 703 F.3d at 1071. The district court ruled that Scherr's
suit was timely but that she lacked standing to sue the other Marriotts and then granted judgment
on the pleadings to Marriott, finding that the spring-hinged door closers "complied with the
applicable ADA regulations." Id. at 1073. The Seventh Circuit affirmed that Scherr only had
standing to sue the Marriott where she suffered the injury because she had not shown any intent
to visit the other Marriotts. Id. at 1074-75. Applying Illinois's two-year limitations period for
personal injury actions, the court then determined that the statute of limitations did not bar
Scherr's suit because Scherr had "alleged that she [was] currently aware of... ongoing ADA
violations" and that "she would return to the hotel but for [those] ongoing violations." Id. at
1075-76.

The Seventh Circuit reached a different result, however, in Soignier. The plaintiff in
Soignier had failed the oral portion of the board certification examination for plastic surgeons
four times, which he attributed to his disabilities. Soignier, 92 F.3d at 549. When the plaintiff
took the oral exam for a fifth time in November of 1992, the certification board granted him
some but not all of the accommodations that he had requested, and he again failed the exam. Id.

---

[8] Defendant argues that the courts in Pickern and Scherr evaluated the statute of limitations issue
"only tangentially, as part of a standing analysis." Def.'s Reply at 6. Although the opinions
demonstrate that the limitations and standing analyses are related, the Pickern court clearly
addressed each issue as a standalone requirement, and the Scherr court did the same, albeit more
briefly.

at 549-50. The plaintiff internally appealed his failure and sought to retake the exam with additional accommodations, but in May of 1993 the board denied the plaintiff's request to retake the exam, and in November of 1994 the board denied the plaintiff's appeal and determined that the 1992 testing procedures were fair. Id. at 550. In May of 1993, the plaintiff sued, alleging that the accommodations for the fifth exam were insufficient and that the board's testing procedures violated the ADA. Id. The district court applied Illinois's two-year personal injury statute of limitations and granted the board's motion to dismiss, concluding that an ADA claim regarding testing "accrues when a covered entity refuses to offer an examination in a manner accessible to an otherwise qualified disabled American" and that the plaintiff's allegations showed that his claim accrued when the board refused to grant him all requested accommodations for the fifth exam. Id. at 550-51.

The Seventh Circuit affirmed that decision, rejecting Soignier's argument that the board had "engaged in a 'continuous course of conduct' against him," and reasoning that "discovery of the original act of discrimination, not future confirmation of the injury or determination that the injury is unlawful, is when the statute of limitations begins to run." Id. at 551 (emphasis in original). Soignier was aware at the time of the fifth exam that the Board had not provided all of his requested accommodations; therefore, his claim accrued on that date. Id. at 552. Moreover, the board's refusals to void the results of that exam or to allow Soignier to take another exam were simply a "confirmation" or consequence of the original decision, rather than "new, separate discriminatory acts," particularly because there could be "only one 'discovery' date for the statute of limitations." Id. at 552-53 (internal quotation marks omitted).

The result in Soignier, in combination with the Fourth Circuit's requirement that a continuing violation consist of a continual series of unlawful acts, demonstrates that RID's

18

purported violations do not constitute a continuing violation such that the statute of limitations period renews with each day that RID maintains its policies. As the defendant argues, the broad principle established in Pickern and Scherr was developed in the context of public accommodations rather than testing, and there is no indication that the Fourth Circuit has adopted such a principle regarding continuing violations under the ADA or its testing provision. Therefore, Pickern and Scherr are not controlling here.

The facts at bar are not entirely analogous to those in Soignier, because Krpan's allegations stretch beyond one request and one denial. There is some indication that the Fourth Circuit might find that Krpan's repeated complaints and RID's repeated refusals to change its policies constitute not a continuing violation but are instead discrete acts of discrimination, each of which triggered a separate limitations period. In an unpublished 2014 opinion not referenced by either party, the Fourth Circuit ruled that although repeated denials of the plaintiff's repeated requests for accommodations in defendants' housing complex did not constitute a continuing offense, they did constitute "multiple discrete acts of discrimination" in violation of the Rehabilitation Act. Hill v. Hampstead Lester Morton Court Partners LP, 581 F. App'x 178, 181 (4th Cir. 2014) (per curiam). The Hill court distinguished such "multiple, discrete acts" from requests to reconsider a single act or complaints regarding the "ongoing effects of a single discriminatory act." Id. at 181 (quoting Jersey Heights Neighborhood Ass'n v. Glendening, 174 F.3d 180, 189 (4th Cir. 1999)) (internal quotation marks omitted). This decision, although not binding and not made in the context of ADA testing accommodations, casts doubt on defendant's argument that plaintiff's complaints "are most accurately described as requests to reconsider RID's position" that cannot extend the statutory limitations period, see Def.'s Br. at 6; however, the decision also confirms that RID's maintenance of its testing and certification policies do not

constitute a continuing violation such that the statute of limitations period continues with each day the policies continue.

Moreover, although plaintiff claims he had multiple meetings and correspondences with RID about his complaints, the record demonstrates that these complaints formed an ongoing course of conduct rather than discrete individual acts in the sense contemplated by the Hill court. For instance, defendant provides an extensive chain of emails between plaintiff and an RID employee during which plaintiff repeatedly asks RID to change the CDI name. See Pl.'s Dep. Ex. 13. These communications demonstrate that plaintiff's complaints were ongoing and essentially continuous, as opposed to discrete requests that were individually denied by defendant. As plaintiff says in one email, "I have been telling RID [of my complaints] for years, for so long, I lost the count." Id. at 5. Plaintiff clearly knew of his purported injuries "for years" before he filed this Complaint and could not identify discrete instances when he complained to RID. To allow Krpan to essentially sit on his ADA claims for years is contrary to both law and sound policy considerations.

Furthermore, even if some or all of RID's responses to Krpan's complaints constituted new discrete acts, the most recent instance identified by plaintiff occurred in November 2013, more than a year before he filed this action. See Pl.'s Dep. 126:11-127:10 (stating that plaintiff met with Feldman and discussed his concerns with both the CDI and NIC certifications). Therefore, even if defendant's repeated refusals to change its policies constituted discrete acts of discrimination, they fall outside the one-year statute of limitations. Consequently, Krpan fails to show either that RID's acts constituted a continuing violation existing until defendant changes its policies or that any discrete discriminatory refusal by RID in response to a request by plaintiff falls within the one-year statute of limitations.

Accordingly, the Court finds that both counts of Krpan's Complaint are time-barred.

### D. Count I: NIC

Even though Krpan's claims are time-barred, the substantive aspects of his ADA claims will be addressed because they appear to present issues of first impression in this Circuit that merit discussion. Plaintiff contends that the NIC violates the ADA by measuring an applicant's impaired sensory skills when those skills are not the factors the examination purports to measure and by then "broadcast[ing] to prospective employers that any NIC holder does not have the disability of deafness." Pl.'s Br. at 6-7. Plaintiff further argues that RID's "market justification" fails. Id. at 7-8 (internal quotation marks omitted). In contrast, defendant claims that plaintiff's NIC claim fails because hearing and speech are among the factors the NIC exam measures, the accommodation sought by plaintiff would fundamentally alter the NIC examination, and altering the exam would unduly burden RID. Def.'s Br. at 17-21. Plaintiff responds that the test is not intended to test for hearing and does so only inadvertently, that his proposed accommodation would not fundamentally alter the exam, and that any changes would not unduly burden RID because RID is already planning to redevelop the test. Pl's Opp'n at 6-8.

Plaintiff relies for his argument on 42 U.S.C. § 12189, which provides that

> Any person that offers examinations or courses related to applications, licensing, certification, or credentialing for secondary or post-secondary education, professional, or trade purposes shall offer such examinations or courses in a place and manner accessible to persons with disabilities or offer alternative accessible arrangements for such individuals.[9]

---

[9] The regulations applicable to this section establish that:

> Any private entity that offers examinations or courses related to applications, licensing, certification, or credentialing for secondary or postsecondary education, professional, or trade purposes shall offer such examinations or courses in a place and manner accessible to persons with disabilities or offer alternative accessible arrangements for such individuals.

Critical to evaluating the merit of Krpan's complaint is the requirement that a private

entity "select[] and administer[]" the examination

> so as to best ensure that, when the examination is administered to an individual
> with a disability that impairs sensory, manual, or speaking skills, the examination
> results accurately reflect the individual's aptitude or achievement level or
> whatever other factor the examination purports to measure, rather than reflecting
> the individual's impaired sensory, manual, or speaking skills (except where those
> skills are the factors that the examination purports to measure).

28 C.F.R. § 36.309(b)(1)(i) (emphasis supplied). Moreover,

> A private entity offering an examination covered by this section shall provide
> appropriate auxiliary aids for persons with impaired sensory, manual, or speaking
> skills, unless that private entity can demonstrate that offering a particular auxiliary
> aid would fundamentally alter the measurement of the skills or knowledge the
> examination is intended to test or would result in an undue burden.[10]

28 C.F.R. § 36.309(b)(3) (emphasis supplied).

The essential issue here is whether the NIC examination purports to measure an

applicant's sensory or speaking skills and therefore meets the exception in 28 C.F.R.

§ 36.309(b)(1)(i). Plaintiff argues that RID admits that the test measures hearing or speaking

ability only inadvertently rather than intentionally and that the test therefore does not satisfy the

requirement that RID "best ensure" that the exam measures candidates' aptitude rather than their

impaired sensory skills. Pl.'s Opp'n at 7. Defendant counters that the NIC measures an

---

28 C.F.R. § 36.309(a).
[10] This section goes on to clarify that

> Auxiliary aids and services required by this section may include taped
> examinations, interpreters or other effective methods of making orally delivered
> materials available to individuals with hearing impairments, Brailled or large print
> examinations and answer sheets or qualified readers for individuals with visual
> impairments or learning disabilities, transcribers for individuals with manual
> impairments, and other similar services and actions.

28 C.F.R. § 36.309(b)(3).

individual's ability to "directly hear the information and simultaneously, instantaneously render it into sign language and simultaneously, immediately render [sign language] into clear intelligible spoken English," and that a candidate cannot accomplish this without being able to hear and speak English. Def.'s Reply at 10. Plaintiff essentially acknowledges this fact by stating that "a deaf person, by definition, cannot possibly translate spoken English into ASL without an accommodation." Pl.'s Br. at 7.

Although RID admits that the NIC exam is not an audiogram, the exam nonetheless obviously purports to measure an applicant's ability to hear English, to translate that English into ASL, and to then speak English by translating that ASL into spoken English. The skills of hearing and speaking are essential aspects of this test, and therefore are among the primary skills that, besides being able to communicate in ASL, the NIC exam purports to measure. Moreover, the regulation does not include the intentionality requirement that plaintiff seeks to impose on RID. RID may not have specifically intended to test hearing and speaking, but doing so is logically and practically inseparable from the simultaneous translation skills RID does intend to test. Therefore, the exam does not violate Title III of the ADA on this basis.

An additional issue with regards to the NIC exam is whether plaintiff's requested accommodation "would fundamentally alter the measurement of skills" the exam is meant to test or whether it would result in an undue burden on RID. See 28 C.F.R. § 36.309(b)(3). Plaintiff at one point states that he is not seeking an accommodation for the NIC exam but is instead challenging a prerequisite that the candidate be hearing, Pl.'s Br. at 6; however, plaintiff clearly states in his Complaint and elsewhere in his memoranda that he is seeking an accommodation in the form of a "hearing interpreter [who] would render the audible speech portions of the exam into ASL and render Mr. Krpan's ASL into spoken English." Pl.'s Opp'n at 6. Plaintiff also

23

proposes that the test be altered by allowing the video vignettes to be paused to allow for what would amount to consecutive rather than simultaneous interpretation. Id.; see also Def.'s Reply at 7.

Defendant correctly argues that both proposals would fundamentally alter the nature of the NIC exam. The test is "designed to test the specific market requirements for an individual who is bilingual and can simultaneously render from spoken English into ASL and from ASL into spoken English." Witter-Merithew Dep. 27:14-18. The test therefore is focused specifically and exclusively on bilingual individuals and their ability to handle instantaneous translation, an ability that is crucial in a variety of situations where simultaneous interpretation is necessary or desirable. It is undisputed that plaintiff cannot hear spoken English and cannot speak it. It appears that he can perform some lip-reading, but portions of the NIC exam simulate real-world situations where the candidate is not facing the speaker and therefore cannot read lips. Def.'s Br. at 18 n.4. Therefore, if plaintiff took the exam with his requested accommodation of a hearing interpreter, it would be the hearing interpreter, rather than plaintiff, who would be rated on his bilingual capabilities and his ability to hear and speak English. Plaintiff's role would be essentially superfluous and he could only be rated on the ASL that he mirrored back to the hearing interpreter after the interpreter signed that same ASL to plaintiff.[11] Moreover, pausing the video would fundamentally alter the test's intention to simulate real-world situations where instantaneous translation is required. As a result, plaintiff's requested accommodations would completely defeat the overarching purpose of the NIC exam and the test would "become a farce." Def.'s Reply at 9.

---

[11] Plaintiff repeatedly states that he "can convert ASL…and non-ASL sign language into his own highly skilled ASL." Pl.'s Opp'n at 12. Plaintiff does not explain what makes his ASL "highly skilled" or what significance this ability has on whether he could pass the NIC exam as it is currently structured.

Ironically, plaintiff admits to hiring NIC interpreters in the past and used NIC interpreters during his deposition in this litigation. Plaintiff also admits that "there are certain circumstances where simultaneous interpreting would be, or is more appropriate than consecutive interpreting, and states that there are "really a lot of times" and "even millions" of times that simultaneous interpretation is needed. See Pl.'s Dep. 58:1-4, 58:11-12, 62:11-14. Plaintiff's admission that simultaneous interpretation is necessary or desirable in "millions" of situations clearly establishes that his requested changes or accommodations would fundamentally alter the nature of the NIC exam.

Additionally, the evidence in the record shows that the plaintiff's proposed changes to the exam would result in an undue burden on defendant. An accommodation under the ADA causes an undue burden "when it requires significant difficulties or expense when considered in light of a number of factors, including the type of service or product being offered." Rawdin v. Am. Bd. of Pediatrics, 985 F. Supp. 2d 636, 656 (E.D. Pa. 2013) (citing Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 88 (2d Cir. 2004)). The budget and size of the entity, type of operation, and nature and cost of the accommodation requested are all relevant to the undue burden inquiry. 28 C.F.R. § 42.511(c) (implementing regulations for Section 504 of the Rehabilitation Act of 1973); accord 45 C.F.R. § 84.12(c) (reasonable accommodations by employers).

Defendant presents unrebutted evidence that to meet plaintiff's demands it would have to change the entire NIC exam, in part by training new raters to assess hearing-impaired candidates. See Witter-Merithew Dep. 79:2-81:7. Defendant also provides unrebutted evidence that it cost between $750,000 and $1,000,000 to develop the NIC exam in 2002, Wiiter-Merithew Dep. 81:3-7, and that changing the test in the ways contemplated by plaintiff would require a similar expenditure. Witter-Merithew Dep. 82:11-83:8. Additionally, RID would have to provide an

accommodation to non-hearing individuals who wanted to take the exam and would have to pay approximately $120 per exam to hire an interpreter, Def.'s Br. at 20, even though RID already absorbs a loss of about $55 on each exam.[12] Witter-Merithew Dep. 81:17-22. Finally, RID contends that the NIC certification would be completely devalued because it would no longer signify to employers that an individual could perform simultaneous bilingual interpretation without an additional interpreter. Def.'s Br. at 20-21.

Plaintiff argues that RID is already planning to spend $500,000 to $750,000 to enhance the NIC as it ages—primarily by updating questions so that repeat test-takers are not advantaged—and therefore his requested changes to the exam would not constitute an undue burden. Pl.'s Opp'n at 8 (citing Witter-Merithew Dep. 99:10-110:3[13]). Defendant correctly responds that this update is "wholly independent and separate" from the additional costs of fundamentally altering the exam if it had to meet plaintiff's requests. Def.'s Reply at 10-11. Defendant's other unrebutted evidence further demonstrates that RID, a non-profit entity, lacks sufficient funds to overhaul the NIC exam in this way, see Witter-Merithew Dep. 82:11-83:8, and defendant convincingly argues that even if RID could afford to change the exam, it would then face substantial additional costs in continuing to offer the exam, both in terms of the value of its credentials and in terms of operating costs. Def.'s Br. at 20-21. This evidence is sufficient to demonstrate that plaintiff's requested accommodations would constitute an undue burden on RID.

---

[12] Defendant also states that approximately 30 states have licensure laws referencing RID certifications and those laws would need to be addressed should the exam change. Witter-Merithew Dep. 46:1-19.

[13] It does not appear that either party has provided the Court with this portion of the deposition transcript.

The final issue raised in Count I is whether the NIC certification impermissibly promotes discrimination by certifying to third party employers that a holder of an NIC certification is not deaf. Plaintiff raises unsupported contentions that RID seeks to enable discrimination by employers, arguing that RID does not want to change its NIC requirements because the certification would lose its value by no longer guaranteeing to employers that they will not need to provide an accommodation to an NIC interpreter. Pl.'s Opp'n at 7. Plaintiff contends that RID's purported "business need" enables and perpetuates discrimination, id.; however, plaintiff provides no authority demonstrating that RID's provision of a credential that certifies that an individual is equipped to provide simultaneous interpretation in any way violates Title III. The preceding discussion demonstrates that RID's testing practices are in accordance with the ADA, and the record as a whole shows that RID seeks to provide deaf individuals access to interpreters in a variety of situations, including ones in which the interpreter must be bilingual and capable of simultaneous interpretation.

Accordingly, because no reasonable jury could find that the NIC exam and certification violate Title III of the ADA, defendant will be granted summary judgment on Count I.

### E. Count II: CDI

In Count II, Krpan contends that the CDI impermissibly measures an applicant's impaired sensory skills, illegally tells employers that CDI holders are deaf, and relegates CDI holders to a second-class category of interpreters. Pl.'s Br. at 8-9. Defendant responds that including the descriptive word "deaf" in the CDI certification does not violate the ADA because the ADA does not require confidentiality on the part of licensing entities, that the CDI deafness requirement neither discriminates against disabled persons nor measures deafness, and that any alterations or accommodations in the CDI test would fundamentally alter the CDI and impose an

27

undue burden on defendant. Def. Registry of Interpreters for the Deaf, Inc.'s Opp'n to Pl. John

Krpan's Mot. for Summ. J. [Dkt. No. 55] ("Def.'s Opp'n") at 16-21, Oct. 23, 2015. Defendant

also argues that any purported discrimination by third party employers against CDI holders is not

attributable to RID. Def's Br. at 23.

Plaintiff responds to defendant's arguments by insisting that the CDI is discriminatory

because a hearing person could theoretically possess the skills CDI seeks to test but is barred

from taking the exam and that the CDI credential operates as a "consolation prize" that enables

discrimination by employers. Pl's Opp'n at 10-11. He further argues that the fundamental

alteration and undue burden exceptions do not apply where he is challenging a prerequisite rather

than seeking an accommodation.[14] Pl.'s Reply to Def.'s Opp'n to Pl.'s Mot. for Summ. J. [Dkt.

No. 57] ("Pl.'s Reply") at 12, Oct. 29, 2015.

The same statutory section and accompanying regulations govern analysis of the CDI

claim.[15] The initial issue here is whether the CDI certification violates Title III by labeling CDI

credentialed individuals as "deaf." RID relies on Third Circuit authority for the proposition that

Title III does not explicitly require confidentiality from the parties regulated under that title,

unlike Title I of the ADA which explicitly requires employers to protect the confidentiality of

---

[14] Eliminating the requirement that a candidate be deaf is not an accommodation that would entail the use of an auxiliary aid. Therefore, the fundamental alteration and undue burden exceptions are not applicable with respect to Count II and the parties' arguments on this point will not be addressed in any further detail.

[15] Plaintiff repeatedly argues that the "best ensure" language in 28 C.F.R. § 36.309(b)(1)(i) should be accorded Chevron deference, see Chevron, U.S.A., Inc., v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984), because Section 12189 is ambiguous as to the meaning of "in a place and manner accessible to persons with disabilities." See Pl.'s Br. at 10. As defendant correctly argues, plaintiff's deference discussion "wholly misses the mark." Def.'s Opp'n at 21. Defendant does not contest that this regulation deserves deference or is controlling in this action; rather, defendant argues that the CDI exam is obviously accessible to persons with disabilities and that it measures those candidates' abilities to translate non-ASL into ASL rather than measuring their impaired sensory skills.

their disabled employees. Def.'s Br. at 24 (citing <u>Doe v. Nat'l Bd. of Med. Exam'rs</u>, 199 F.3d 146, 148 (3d Cir. 1999)). Plaintiff does not provide any authority to rebut this showing and largely concedes the point by failing to address it in detail in his opposition brief, instead claiming only that "RID placed itself in violation of Title III when it created an inferior credential that flagged its holders as deaf even though deafness is not necessary in order to develop the skills tested." <u>See</u> Pl.'s Opp'n at 13. Plaintiff does not point to any statutory text or regulations prohibiting a credentialing entity like RID from using "deaf" in its name. Instead, plaintiff relies on policy arguments that doing so perpetuates discrimination, arguments that RID refutes by presenting unrebutted expert testimony that the term "deaf" has been used and widely accepted for at least two decades as a term of empowerment and of cultural and linguistic identity. <u>See</u> Boudreault Report at 10. Therefore, RID has neither a statutory nor a moral duty to remove the word "deaf" from its CDI credential.

Furthermore, plaintiff fails to show that RID violates the ADA by limiting CDI test-takers to non-hearing individuals. Again, the statutory text weighs against plaintiff's arguments. Plaintiff contends that the ADA's legislative history shows that it is intended to work against "exclusionary qualification standards and criteria…and relegation to lesser….benefits, jobs, or other opportunities." Pl.'s Opp'n at 12 (quoting 42 U.S.C. § 12101(a)(5)) (internal quotation marks omitted). Plaintiff argues that the CDI confines deaf interpreters to a narrow realm of more limited opportunity and measures disability rather than aptitude, thereby functioning as a second class "consolation prize credential." Pl.'s Opp'n at 11 (internal quotation marks omitted).

Defendant does not dispute that the ADA is intended to prevent exclusionary criteria and discrimination, but argues that the ADA only bars discrimination against and exclusion of disabled persons. Def.'s Reply at 12. As defendant correctly states, the record demonstrates that

there are legitimate reasons for excluding hearing individuals from the CDI exam, but none of those reasons matter because excluding non-disabled persons is not illegal. See id. 42 U.S.C. § 12189 requires that an entity like RID offer its examinations "in a place and manner accessible to persons with disabilities or offer alternative accessible arrangements for such individuals." Neither this provision nor any of the regulations require that the exam be made accessible to persons without disabilities.

Moreover, RID does not violate Title III by testing for deafness rather than a candidate's aptitude or achievement level. Plaintiff's argument that the "deaf" requirement is a prerequisite demonstrates that although candidates must submit proof of their lack of hearing ability before taking the exam, the exam itself does not test for deafness. Rather, the unrebutted evidence is that the CDI test measures a candidate's ability to work monolingually and creatively using ASL, gestures, mime, props, and other tools to communicate. See Witter-Merithew Dep. 19:19-21, 60:6-8; CDI Handbook at 34. Unlike the NIC exam, which does measure hearing ability to some extent, the CDI does not measure hearing ability in any respect.

Lastly, plaintiff offered no evidence to support his claim that interpreters with the CDI credential are disadvantaged by having less opportunity to work. This failure undercuts his claim that the CDI credential is somehow a lesser credential. As RID's expert states, the differences between the NIC and CDI credentials "does not mean one is less qualified than the other; they simply have the more appropriate tools for specific situations." Boudreault Report at 8. For these reasons, RID's exclusion of hearing individuals from the CDI credential is neither illegal nor unjustified.

On this record, because no reasonable jury could find that the CDI exam and certification violate Title III of the ADA, defendant will be granted summary judgment on Count II.

30

III.    CONCLUSION

For the reasons stated above, defendant's Motion for Summary Judgment will be granted

and plaintiff's Motion for Summary Judgment will be denied by an appropriate Order to be

issued with this Memorandum Opinion.

Entered this $\underline{8}^{th}$ day of March, 2016.

/s/

Leonie M. Brinkema
United States District Judge

Alexandria, Virginia

31